May it please the court, Tom Lozier, Mahogany's Burman, Sobel Shakiro, on behalf of plaintiff Capital West Appraisals. This case is about Countrywide, which at its peak originated one in three mortgage loans, just about, in the United States. And Countrywide didn't keep those loans, it sold them into the secondary market, making billions of dollars. In order to keep that train moving, the key to the machinery was originations. And the single roadblock to originations was underwriting, and specifically, value determinations. It was critical to Countrywide that value determinations on properties not hold up or foreclose their ability to make a loan to an otherwise willing borrower. But counsel, your claim is that your client made evaluations which were too high, and Countrywide put him on the blacklist because he was making evaluations which were too high. Isn't that exactly contrary to common sense? No, Your Honor. The allegations in the complaint are quite clear. In the complaint, it's alleged that Mr. Massey refused to inflate appraisals when requested to do so by Countrywide. Because of that, because he wouldn't play ball, they blacklisted him. And the mechanism for doing that, as is spelled out in the complaint, was to tag two appraisals of unique properties for field review. And as it's alleged in the complaint, that sent a signal to the land safe appraiser to knock down that appraisal, to say it's inflated. Because, of course, if land safe's reaction was to say your appraisals are always too low, that would be the proof in the pudding. That would show their scheme is there. The far better way to do it is to take properties where even fully competent and reasonable appraisers could disagree and say those were too high, this is why those were too high. But that's not what they said. They said those were too high and here are a few mistakes you've made in those. So they set him up with too high appraisals in order to put him on the blacklist because he refused to inflate every other one. That's your claim? As it's set forth in the complaint, in fact, what they did is they took these two appraisals and they said these appraisals we would have valued differently. We would have valued them lower and you made mistakes on them. Therefore, we're putting you on the blacklist because of those. But the complaint says that that was pretextual and they really put him on the blacklist because when he was asked at least four times to inflate an appraisal to make a deal go through, he refused to do it. So the argument that, hey, what the reviews show is that you're always too high, that is a convenient and it is a catchy argument, but it isn't a truthful argument. And the reason it's not truthful is that the scheme as precisely laid out calls for LandSafe to do exactly that, find a couple of appraisals that are unique properties in unique areas. And it's not just Mr. Massey. I mean, the complaint alleges this has happened to others as well. It's unique appraisals where they can chop the value down and say you're too high because, of course, if they said you're too low on those, that would be great evidence to put forward and say, look, they even blacklisted me because I was coming in too low. But that's not how the stick works. Is it central to your complaint that Countrywide dominated the home mortgage market in Idaho? No. It is not, and I'll tell you why. The allegations in the complaint are that Countrywide controlled about 30 percent of the nationwide market for residential mortgages, which is a big piece. But what's more important is that the Countrywide UVL is distributed to all mortgage brokers everywhere. This is not a jury, so you can just make your statement without the theatrics. Just for theatrical emphasis, does your client do business in places other than Idaho? No, he does not. Simply in Idaho? Yes. And you'll concede that there's nothing in the record that would suggest that Countrywide dominates the market in Idaho? What's in the record is that it dominates the market in the entire United States. No, Idaho is a very different place. Yes, Your Honor. The evidence in the complaint is that as a result of being blacklisted, Mr. Massey in Capital West was losing $8,000 a month of business. At this stage of the case, in the pleading stage, it certainly can be inferred from that, that a substantial portion of his business has been decimated. And, in fact, the complaint states that. Well, how do we know that? How would we know that $8,000, I mean, based on what Countrywide does, based on what your client does? I mean, how would we know that? And I guess just to follow up on what Judge Hawkins was asking about, you understand, at least it's my understanding, that the tort of duty to provide fair procedures applies only to a private organization's actions in a specific geographical region. You've been talking about how nationally Countrywide affects your client or, you know, others. But where does your complaint make allegations concerning Countrywide's power in Idaho, which appears to be required under this tort of duty to provide fair procedures? Well, I think that, well, first, to answer your question directly, the complaint does not discuss the specific marketplace in the 18 counties of Idaho where Mr. Massey was an appraiser. Did you ask the court to allow you to amend your complaint in that respect? The court issued its order with prejudice. I'll try again. I understand. Did you ask the court to give you leave to amend your complaint, and did the court rule against you on that request? In our pleadings, we did not ask for an opportunity to amend if the motion was granted. In its order, the court issued its order with prejudice. Importantly, the court's order said we failed because we did not show monopoly power. In Idaho. Correct. Right. There was no way we could show monopoly power, and monopoly power is not required. So an amendment under that standard would have been futile because Countrywide, although it had tremendous power, as is alleged in the complaint, it did not have a monopoly. There was no amendment we could make to give the court what the court told us it needed. Your client continued to do business with other lenders? Our client continued to do appraisal business, but many lenders were foreclosed to him because he was foreclosed to Bank of America and Countrywide. For example, in the complaint, there was evidence of a completely separate lender who said when you showed up on the Bank of America Countrywide UVL, we can't use you anymore either. Was he foreclosed, or was he required to, when he submitted an appraisal, to submit a second appraisal? Well, he doesn't submit appraisals directly. Can you answer the question? I'm trying to. I'm asking you whether it's A or B. Was it A, you can no longer submit appraisals to Countrywide, or was it B, if you do submit appraisals to Countrywide, they must be accompanied by a second appraisal? Is it A or B? It's both. It is B in the context of a mortgage broker submitting a package that could ultimately end up at Countrywide. It is A in the fact that Countrywide's retail operations, where they have a storefront selling loans, they won't hire him at all. Okay. So I think coming back to the power issue, which is really the critical issue here. At the pleading stage, does Countrywide know enough to assert their defense to this claim? Do we have to show in the complaint that a certain number, a certain percent of the marketplace was foreclosed to Wade Massey, and therefore the right to fair procedure applies? And if you look at the law as this right has developed, it hasn't centered on a formulaic recital of what power is necessary, because over and over again the mantra has been, is there power to substantially affect the ability of the professional to make his living in his profession? This was your third attempt at stating this claim, correct? No, this was our first attempt at stating this claim. I thought we were dealing with the second amended complaint. Correct. That suggests to me that there was, number one, a complaint, and then a first amended complaint, and then a second amended complaint. Yes, Your Honor. Is that three? It is three, Your Honor, but this claim, the right to fair procedures, was raised for the first time in the second amended complaint. Okay. I get you. So this claim has never been amended. All right. Counsel, you know, I think you're aware that there's a companion case to this called Sound Appraisals v. Wells Fargo, which we've determined has priority on the substantive issue of fair procedure. Yes, Your Honor. Would you kindly address the second cause of action, intentional interference with prospective economic advantage? And what I'm interested in is the requirement under California law in the Korea Supply Company case that the plaintiff must plead that the defendant engaged in an independently unlawful act in making the intentional interference with prospective economic advantage. What independent unlawful act is alleged where in the second amended complaint? Thank you, Your Honor. There are two independently wrongful acts as alleged in the complaint. The first is the violation of the right to fair procedure. The second is a violation of California Civil Code, Section 1090.5. And that section prohibits exactly what is alleged in the complaint, which is that the UVL was misused to force appraisers to play ball. So the statute forbids using a UVL for the purpose of influencing the outcome of an appraisal. And that is precisely what's alleged in the complaint. Well, where in the complaint are there examples of an attempt to influence, let alone to do so with coercion, extortion or bribery? Isn't that what you have to allege? What you have to allege is that the lender is trying to change the outcome of the appraisal. And the complaint discusses the fact that Wade Massey was approached and asked by Countrywide, specifically Devin Farner, to change his appraisals, and he refused. And as a result, he ended up on the UVL, which Devin Farner said he didn't do anything wrong. And Devin Farner also said whenever there was any issue with an appraiser, they just put him on the list. That was his testimony at deposition, and that is in the complaint. Let me read 1090.5 to you. No person with an interest in a real estate transaction involving an appraisal  And now I'm repeating what Judge McGee had just said. Through coercion, extortion or bribery. Now, where do you allege in your complaint that Countrywide committed coercion, extortion or bribery? The allegations in the complaint relate to coercion. Where is coercion? Where are the allegations? I have your complaint here. It's in starting at paragraph 76. I'm sorry, starting at paragraph 81. The complaint discusses the pattern and practice of pressuring appraisers to write an appraisal designed to have the loan underwritten. I'm reading 81. Part of Countrywide's scheme to increase market share and make as many loans as possible involves the corruption of the appraisal process. Countrywide wanted appraisals that supported the loans it wished to make. That's 81. Right. And the section continues, Your Honor. There are, I mean, we could read through the entire section there. Pressuring. And so you think that pressuring appraisals to write an appraisal is coercing them. It is if the stick is, it is if what happens if you don't do it is that you are run out of business, is that every broker you have ever worked with knows from looking at the Countrywide database for which they are given passwords that if you use Wade Massey, you will have to charge your customer an additional $350 and the transaction may be railed off to the side. So the combination of increase your value and if you don't, you're going to be on the UVL, that is coercion because appraisers who go on the UVL aren't appraisers anymore. So it's implicit in your mind. It's express. You're saying that there's express coercion. Yes, Your Honor, and I see that I'm out of time, but the complaint spells out a process under which the appraiser has two choices. He can play ball or she can play ball and put the value at whatever Countrywide tells them in advance it should be at or they can stand up to their valuations, in which case they get put on the UVL pretextually without process and then they no longer get appraisal work from any broker who has any thoughts that the loan might end up at Countrywide, which does get one in three loans at this time. Okay. Thank you very much. Thank you. We'll give you a minute for rebuttal. Good morning. May it please the Court, my name is David Permit and I'm here representing the sole remaining defendant, Countrywide Home Loans. Judge Jones was absolutely right to dismiss this case on the second amended complaint. After three attempts to state claims against my client, there was no claim stated under either the common law duty of fair procedure or intentional interference with prospective economic advantage. Do you think in the context of the allegation that we've just been discussing that pressure is somehow different from coercion? I think pressure is different from coercion. Pressure is subjective. I think coercion is objective. And I don't think in particular that there's really any allegation or specific factual allegation in the complaint that says there was coercion. I was looking at paragraph 96 of the complaint as you were asking your question because that's the allegation about Devin Farner, which is the only allegation that anyone from Countrywide ever asked for there to be a change of value on an appraisal. Specifically, paragraph 96 talks about Mr. Massey was regularly pressured to change the values of his appraisals by brokers. Typically, a broker would call Mr. Massey and ask if they provided him with additional information about the property if Mr. Massey would consider increasing the value he had assigned to the property. Now, I don't think that there's anything improper with a broker or a lender providing additional information and asking someone to reconsider. If you have coercion or bribery on top of that and coerce them to reconsider, that's the issue. If counsel for the plaintiff appellant had used the word coercion instead of pressure, would that have been enough? Under this pleading, I don't think so because in addition to and I think what ICBAL and TWABLY stand for is you can't just pattern or you can't just mimic the elements of a cause of action. You actually have to plead facts that make that plausible. Well, he says in the complaint that basically appraisers were told to play ball or they got UVL'd. He describes it in the complaint as pressure, but if he had said they were coerced into providing appraisals that Countrywide wanted or else they were UVL'd, would that be enough? I don't think so because the specific factual allegations about what happened at Capital West don't make that plausible. I think there would have to be additional factual allegations so that you could draw the inference that that conclusory allegation is plausible. They would have to say on January 13, 2009 at 1047 in the morning, David Jones, an official acting under color authority of Countrywide, approached appraiser John Doe and said blah, blah, blah. That's what you need? As a defense attorney, I would appreciate it if that standard applied, but I don't think the standard is that strict. I think what you would need is you would need enough specific facts so that you could draw the inference. You would need some sort of facts beyond allegations that we complained that their appraisals were too high. All the specific factual allegations are inconsistent with the conclusions of law that are pled, but you need at least enough specific facts to show that there was an attempt to coerce, which if it factually occurred would not be difficult to plead because the plaintiff would have that information available to them. If counsel had used the word coercion instead of pressure, would it have affected your ability to assemble a defense to the claim? I don't believe so, Your Honor. And does the use of pressure make any difference? No, and I would add that the only allegations about pressure are allegations regarding brokers, not my client. The only allegation about Devin Farner, who denied that he did this in his deposition, is that he asked him to change the value. There's no allegation that anyone from the country. Does Farner have the power to put the plaintiff on the UVL? I don't believe so, but that wasn't a record. It's not that he did? No. I mean, here what he's saying is that the two high valuations were picked on as pretexts for the fact that he wouldn't inflate appraisals normally, and he gives us facts on certain addresses, including the Rioja Street appraisal. Why isn't that enough? Because the facts alleged don't plausibly state the claim. The facts alleged, if you look at specifically what's alleged about those appraisals, Mr. Massey, and this is all on the complaint, acknowledged that there were mistakes. He acknowledged that the appraised values were above the listing price. He acknowledged that there were differences in the comparables and that the comparables he used had larger gross living area. He tried to explain that away as part of his attempt to appeal his placement on the UVL, but there's nothing specifically there that involves any coercion or improper, anything that you could draw the inference to. But what you're saying is under Iqbal and Twombly, what he's got to say is I was pressured to raise appraisals as to this property, second property, and the third property, something like that. I think that would be one way to satisfy Iqbal and Twombly. I don't know if that's the only way, but I think that would be one way. When Countrywide makes a loan, isn't it aware of who has done appraisals? After it makes the loan? When it makes the loan. Yes, well, during the underwriting process, it receives an appraisal. So how is it possible that Countrywide, because this is a point that was made, I think, on behalf of Countrywide, how is it possible that Countrywide could not have known the mortgage brokers with whom Mr. Massey had a business relationship? The mortgage broker is not necessarily going to be on the appraisal, but I would admit in the package you would know, if you looked at the package as a whole, you would know who the broker was and you would know who the appraiser is. But you wouldn't necessarily know that there is a relationship, an economic relationship between that broker and Mr. Massey, apart from that one transaction. You wouldn't know that there would be any expectation that Mr. Massey would have that he would get additional business from those brokers. And that is not alleged in the complaint either. I have a question here on the Fair Claims Act. Sure. In light of the Palm case, does Capital West have to, or it has continued to work as an appraiser, does this necessarily preclude it from alleging a fair claims procedure claim or a fair procedures claim? That it has continued to work as an appraiser? No, I wouldn't read the cases to say that you have to be put out of business to bring this claim. What I read the cases to say is that there has to be a substantial impact on your ability to continue in the profession. And I think that the substantial impact that those cases look at is more, requires more than just a reduction in your revenue. Now, in this case, we don't know what an $8,000 reduction is. We don't know if that's a 1% or a 10%. It's just never alleged in the complaint. But if you look at the cases, I think they use the loss of revenue as a proxy for whether or not this is a practical necessity to join, to be a member of this group or to have this accreditation. Because a lot of the cases talk about whether or not there's a practical necessity. And they'll point to the fact that they lost 70% of their business. They no longer compete for 60% of the market and things like that. So all of the cases, you know, require a loss of business plus something more. You know, you had in Ezekiel the person not only lost business and couldn't go into hospitals, but they could not be a board-certified general surgeon. And Pinsker could not hold himself out as a certified orthodontist and compete for that business. So it was in addition to just the pure economic harm, there was also an inability to compete in the marketplace. I mean, if it was just I lost business, then the exception would swallow the rule because anyone who is excluded from membership or accreditation could potentially lose business. And I think that's what the Yari case says. So should Capital West be allowed to amend their complaint at this point? No. Well, they've been allowed twice. In addition, you know, I understand that this is the first time that they raised a fair procedures claim, but there's no explanation for why they couldn't have raised a fair procedures claim in the original complaint or the first amended complaint. And I think in his discretion, Judge Jones decided that this is the third. There have already been three complaints, and enough is enough. He cited to the Moore case in the Ninth Circuit. In addition, I think what we cited to in the footnote on the last page of our brief is another Ninth Circuit authority that goes to a question my colleague received earlier that they never asked for leave to amend, nor did they raise it in their initial brief, and therefore they've waived the right to amend. I'm mindful of this court's order from earlier this week, so I don't want to spend too much time on whether or not a mortgage lender can be a gatekeeper. But I did want to spend at least a little time talking about or just letting you know that I think that there are some differences between the sound appraisal case that's pending in San Francisco today and in my case. I will acknowledge that I believe that if the sound appraisal panel decides that a mortgage lender is not a gatekeeper, to which the common law duty of fair procedures applies, I believe if you agree with the panel, we win this case. Does it matter? Does it matter? Does not matter. Yeah. If they have priority and they rule that way, we have to follow their ruling. But I think that there are also differences in the allegations that are important to point out, because even if they say it could potentially apply to mortgage lenders, I think on this complaint it doesn't apply to countrywide. One of the differences, obviously, is you have two different defendants. You have different allegations about market share, although both of them are alleged to have the greatest market share in the country. You have different allegations about market share in the geographic area to the extent that those are made. We're dealing with different geographic areas. We're dealing with different plaintiffs as well and different economic impacts. We're also dealing with a slightly different situation in terms of the list. Wells Fargo, the allegations in sound appraisal, was that those plaintiffs were removed from a preferred provider list, that they were already on a list of approved appraisers that Wells Fargo used. This was not a preferred appraisal list that Capital West was removed from. Capital West, who had no previous relationship with countrywide or expectation of doing countrywide business, was put on the unacceptable vendor list. There's a difference between a good list and a bad list. In Wells Fargo, there was a good list, and sound appraisal was kicked off. In countrywide, there was no good list, but there was a bad list, and he was put onto it. So I don't think that much. Why don't you address the issue that I think we discussed earlier, which is are there any allegations that countrywide had gatekeeper economic power in Idaho? There are absolutely no allegations. What's wrong with the plaintiff's argument that since countrywide originated or manufactured one-third of the loans in the country, appearing on the UVL of countrywide was a death sentence regardless of what state it is? Well, I think there's a recognition implicit in the statute that there are local differences in terms of market power and in terms of people's ability to conduct business. What statute? We're talking about common law? Not the statute. I shouldn't have said statute. The common law duty, as it's interpreted by the court. It's always tethered to a particular geographic area. And I think the problem is that you have to show a substantial impact on the ability of capitalists to do business. And if you can't allege that countrywide has power in the market in Idaho, you can't make that showing, at least at the pleading stage. And I will say that 33% of the market is inaccurate, and I don't think I didn't see that in the complaint. But I haven't seen any case in where just saying someone has 33% of the market by itself was sufficient. If that was the case, then the largest, you know, this is a vendor-vendee relationship. And if that's the case, then the largest market participant is always going to be shackled with the common law duty, which I don't think is California law. Suppose the San Francisco panel, which has priority, constructs a new definition or a more nuanced definition of gatekeeper. In that event, shouldn't the plaintiff in this case be allowed a further opportunity to amend, to comply with that ruling? I don't think so. I think that Judge Jones was within his right to say that three complaints is enough and is supported by authority. Obviously, that's in your discretion, but I think this is the second amended complaint and they did not ask for the right to amend it again. Even if the San Francisco panel constructed an entirely new rubric for an element for what constitutes a gatekeeper, and this is brand new, wouldn't have existed when Judge Jones dealt with this case, they shouldn't be given an opportunity to amend. I think they've waived it. Okay. Thank you very much, Ruben. Thank you. It's also your time. Mr. Lesser? Hello, sir. Would you have one minute? Thank you, Your Honor. Your Honor, I would like to take my minute to point out specific paragraphs of the complaint which are responsive to the Court's earlier questions. Specifically, paragraph 84 discusses coercion. Paragraph 86 discusses the scenario where the appraisal when it's referred to LandSafe for review is supposed to get shot down. That was part of the scheme, and that's why the result was that they came back at him with appraisals that were too high. You said 84. What's the other? 86. Okay. Paragraph 87 discusses the scenario where the identical appraisal that LandSafe said was too high was submitted by another appraiser and it was just fine. And that goes to the point that just because they tried to put him on the list by saying he's too high, that was pretextual. Obviously, if the only thing that changes is the name and the appraisal's fine, then it's a pretext to say that we're throwing him off because it was too high. Are these appraisals of which you speak, plaintiffs submitted an appraisal that was flagged for a field review, are they described with specificity sufficient to pass the Iqbal and Twombly test? And if so, which appraisals are we talking about? Is that Rioja Street is one of them? Can you tell me? Are you just alleging a custom and practice, or are you talking about specific appraisals? I believe paragraph 87 refers specifically to either Rioja or Upper Fitches because those were the ones that were flagged for field review. So I think in the scenario of the complaint as written, yes, it did refer to those ones. Paragraphs 90 and 91 of the complaint, specifically 90 talks about countrywide representatives pressuring Capital West to increase valuations, and 91 talks about that when Capital West refused to succumb to that pressure, it was put on the field review list. This all goes to the coercion aspect we discussed. Paragraph 107. Again, this goes to the... All right, I think that you've done two things. You've listed some paragraphs which you want us to read, and two, you've exhausted your time. Thank you very much. Thank you, Your Honor. The court appreciates the arguments submitted by the parties. In the case of Capital West Appraisals LLC versus Countrywide Financial Corporation is submitted, subject to the court's earlier order. And court is adjourned for the week. Thank you very much.
judges: Hawkins, Bea, Murguia